**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| PRUDENTIAL LOCATIONS LLC, a Hawaii limited liability company, *Plaintiff-Appellant*, <br><br> v. <br><br> U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, *Defendant-Appellee*. | No. 09-16995 <br><br> D.C. No. 1:09-cv-00128-SOM-KSC <br><br><br> OPINION |

Appeal from the United States District Court
for the District of Hawai'i
Susan Oki Mollway, Chief District Judge, Presiding

Argued and Submitted
February 15, 2011—Honolulu, Hawaii
Reargued and Resubmitted
March 9, 2012—Pasadena, California

Filed October 9, 2013

Before:  A. Wallace Tashima, William A. Fletcher,
and Marsha S. Berzon, Circuit Judges.

Per Curiam Opinion;
Dissent by Judge Berzon

**SUMMARY**[*]

**Freedom of Information Act**

The panel affirmed the district court's summary judgment in favor of the U.S. Department of Housing and Urban Development and held that Exemption 6 of the Freedom of Information Act justified the agency's decision to redact identifying information.

Plaintiff filed a Freedom of Information Act ("FOIA") request with HUD, asking it to disclose the names of the individuals who had complained to HUD that plaintiff had violated the Real Estate Settlement Procedures Act. The panel held that the identity of a person complaining to a federal agency about a violation of law is protected from disclosure under Exemption 6 of FOIA.

Judge Berzon dissented, and would remand to the district court for further factual development because the present record is inadequate to confirm the existence of any personal privacy interest to justify invocation of FOIA's Exemption 6.

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Jason H. Kim (argued), Schneider Wallace Cottrell Brayton Konecky, LLP, San Francisco, California; Paul Alston, Alston Hunt Floyd & Ing, Honolulu, Hawaii, for Plaintiff-Appellant.

Steve Frank (argued), United States Department of Justice, Civil Division, Washington, D.C., for Defendant-Appellee.

**OPINION**

PER CURIAM:

The question in this case is whether the identity of a person complaining to a federal agency about a violation of law is protected from disclosure under Exemption 6 of the Freedom of Information Act ("FOIA"). Plaintiff Prudential Locations ("Prudential") filed a FOIA request with the U.S. Department of Housing and Urban Development ("HUD"), asking it to disclose the names of the individuals who had complained to HUD that Prudential had violated the Real Estate Settlement Procedures Act ("RESPA"). (For convenience, we will use the plural even though it is possible that the two complaints were written by the same person.) HUD invoked Exemption 6 to justify redacting the documents to conceal the authors' identities. Exemption 6 covers "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). The district court held that Exemption 6 justifies the agency's decision to redact identifying information. *Prudential Locations LLC v. U.S.*

*Dep't of Housing & Urban Dev.*, 646 F. Supp. 2d 1221 (D. Hawai'i 2009).  We affirm.

### A.  Background

HUD is the agency responsible for administering and enforcing RESPA, 12 U.S.C. §§ 2601–2617.  RESPA prohibits referral fees for real estate settlement services: "No person shall give and no person shall accept any fee, kickback, or thing of value [for referring] business incident to or a part of a real estate settlement service involving a federally related mortgage loan."  *Id.* § 2607(a).  HUD initiated two investigations of Prudential when it received communications, sent five years apart, alleging that Prudential gave referral awards in violation of RESPA.

In the first communication, the author wrote a one-page letter dated July 7, 2003, (the "2003 Letter") alleging that "Prudential Locations Real Estate Salespersons get monetary kickbacks ($$,$$$) for the amount of business that is referred to Wells Fargo."  The author explained that "Wells Fargo" was shorthand for Wells Fargo Home Mortgage of Hawaii, a joint venture formed by Wells Fargo Bank and Prudential Locations.  The author attached an article published on January 26, 2003, in the *Honolulu Star-Bulletin*, quoting it as saying that "agents from firms . . . throughout Hawaii . . . were eligible to win [a] Mercedes by referring at least $1 million in loans to Wells Fargo in 2002."  The author asked, "Is it a violation of RESPA for real estate agents to receive compensation for steering business to a specific Lender?"  The author stated that he or she anticipated that HUD would provide a written reply.  The author neither asked for anonymity nor authorized HUD to reveal his or her identity.

In response to the letter, HUD opened an investigation. HUD discovered, consistent with the letter's allegations, that Prudential rewarded agents with "prizes" in return for referring over $1 million of business to Wells Fargo.  The prizes included a Mercedes-Benz lease and vacation packages to Thailand and Las Vegas.  HUD closed the investigation in 2005 after entering into a settlement agreement under which Prudential agreed to stop violating RESPA and to pay a penalty of $48,000.

In the second communication, the author wrote HUD an email dated January 19, 2008 (the "2008 Email").   The author, who was aware of the $48,000 penalty imposed under the 2005 settlement agreement, wrote that Prudential was "blatantly violating RESPA laws again."  The author alleged that Prudential was "charging an extra fee for an in house transaction coordinator EVERY TIME to agents that do not use ($75 extra fee) Wells Fargo (affiliated company of Prudential Locations LLC) and ($50 extra fee) Island Title (affiliated company of Prudential Locations LLC)."   The author wrote that an agent from Prudential gave the author this information and "expressed concern that his company was violating RESPA laws again."  The author of the 2008 Email asked HUD to keep his or her name anonymous.

In response to the 2008 Email, HUD opened a second investigation.  In March 2009, it concluded that the evidence did not substantiate the email's allegations and closed the investigation.

In June 2008, while the second investigation was underway, Prudential made a FOIA request for HUD's records of the two investigations.  Prudential specifically asked HUD to produce information "to show the identity of

all parties who provided information to HUD relating to the initiation" of both HUD investigations.  In March 2009, HUD produced roughly four-hundred pages of responsive documents.

HUD produced the 2003 Letter and the 2008 Email in response to the FOIA request, but it redacted information in both documents in order to conceal the authors' identities. HUD redacted the letterhead and the signature line of the 2003 Letter.  HUD produced a redacted version of the 2008 Email as part of its initial response, and it turned over a less redacted version of the email during the course of this litigation.  In the less redacted version, HUD redacted the "From" field in the email header, the first sentence, and the author's contact information.  HUD also redacted language after the phrase "but I would like to remain anonymous."  The length of this redaction suggests that it contained ten or eleven average-length words.  Its location in the email suggested that the redacted language explained why the author desired anonymity.

In a letter to Prudential's attorney, HUD justified the redactions under Exemption 6.  HUD explained that "[r]elease of this information would constitute an unwarranted invasion of personal privacy" outweighing any "interest of the general public in reviewing these portions of government documents."

Shortly thereafter, Prudential brought suit in federal district court specifically seeking disclosure of the identities of the authors of the two communications. Prudential moved for summary judgment.  HUD filed a cross-motion for summary judgment that included an affidavit from Ivy Jackson, HUD's Director of the Office of RESPA and

Interstate Land Sales. Jackson described HUD's general policy of concealing the identity of any complainant "whether or not the complainant affirmatively authorized the release [of his or her name]." However, it appears that HUD may release the complainant's name under certain circumstances if the "person has specifically authorized release of his or her name." She explained that HUD relies on "industry competitors and insiders" as sources of information to detect RESPA violations. She feared that industry insiders would be "vulnerable to retaliation, i.e. loss of employment, loss of business and legal action," if HUD were forced to disclose their identities. Jackson stated that when she speaks before industry groups, she reminds industry insiders of HUD's policy of confidentiality.

The district court entered summary judgment in favor of HUD, holding that the redacted information was protected from disclosure under Exemption 6. *Prudential Locations*, 646 F. Supp. 2d at 1228. The court balanced the privacy interest of the individuals whose names were redacted against the public's interest in disclosure. *Id.* at 1226. On the privacy-interest side, the court found that complainants reporting RESPA violations could be subject to retaliation. *Id.* at 1226–27. On the public-interest side, the court found that disclosure of the complainants' identities would not reveal significant and otherwise unavailable information about HUD's activities. *Id.* at 1227. The court also found that Prudential provided no evidence indicating that the identity of complainants would reveal any misconduct or bias on the part of HUD. *Id.*

After initial argument in this case, we reversed the district court, holding that HUD could not redact identifying information under Exemption 6, absent an additional showing

concerning the identity of the complainants and the privacy interests that were likely to be infringed.  *Prudential Locations LLC v. U.S. Dep't of Housing & Urban Dev.*, 648 F.3d 768 (9th Cir. 2011).  On the government's petition for panel rehearing, we ordered the case reargued.  We now affirm.

## B.  Standard of Review

"[A] two-step standard of review applies to summary judgment in FOIA cases.  The court first determines under a *de novo* standard whether an adequate factual basis exists to support the district court's decisions.  If an adequate factual basis exists, then the district court's conclusions of fact are reviewed for clear error, while legal rulings, including its decision that a particular exemption applies, are reviewed *de novo*."  *Lane v. Dep't of Interior*, 523 F.3d 1128, 1135 (9th Cir. 2008) (internal citations omitted).

## C.  Discussion

FOIA grants access to government archives for public dissemination of "'official information long shielded unnecessarily from public view.'"  *Milner v. Dep't of Navy*, 131 S. Ct. 1259, 1262 (2011) (quoting *EPA v. Mink*, 410 U.S. 73, 80 (1973)).   Under FOIA, an agency must make government records available to the public upon a properly made request.  5 U.S.C. § 552(a)(3)(A).  However, the agency need not disclose documents or information falling within any of nine statutory exemptions.  *Id.* § 552(b)(1)–(9).   The agency bears the burden of justifying the withholding of information under an exemption.  *Id.* § 552(a)(4)(B).

Exemption 6 allows an agency to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." *Id.* § 552(b)(6). We ask two questions in deciding whether an agency has properly withheld records or information under Exemption 6. First, we ask whether the document qualifies under the heading of "personnel and medical files and similar files." *Id.* Second, we ask whether production of the document, or information contained therein, "would constitute a clearly unwarranted invasion of personal privacy." *Id.*; *see, e.g.*, *Elec. Frontier Found. v. Office of the Dir. of Nat'l Intelligence*, 639 F.3d 876, 886 (9th Cir. 2010); *Forest Serv. Emps. for Envtl. Ethics v. U.S. Forest Serv.*, 524 F.3d 1021, 1024 (9th Cir. 2008).

## 1. "Personnel and Medical Files and Similar Files"

Exemption 6 was "'intended to cover detailed Government records on an individual which can be identified as applying to that individual.'" *U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 602 (1982) (quoting H.R. Rep. No. 89-1497, at 11, *reprinted in* 1966 U.S.C.C.A.N. 2418, 2428). "Information unrelated to any particular person presumably would not satisfy the threshold test." *Id.* at 602 n.4. The Supreme Court has concluded that the phrase "similar files" in Exemption 6 has a "broad, rather than a narrow, meaning." *Id.* at 600. "Similar files" include files containing citizenship information on specific individuals, *id.* at 602; reports on interviews with Haitian nationals involuntarily returned to Haiti, *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991); a report analyzing an agency's response to a wildfire, *Forest Serv. Emps.*, 524 F.3d at 1024; and an "*Excelsior* list" of names and addresses of employees eligible to vote in a union

representation election, *Van Bourg, Allen, Weinberg & Roger v. NLRB*, 728 F.2d 1270, 1273 (9th Cir. 1984).

The district court in this case held that the 2003 Letter and the 2008 Email are "similar files" within the meaning of Exemption 6. *Prudential Locations*, 646 F. Supp. 2d at 1226. We are skeptical that a communication sent by an individual to a federal enforcement agency complaining about illegal business activity is sufficiently "similar" to a "personnel or medical . . . file" of that individual for the communication to qualify under Exemption 6. We recognize that the district court's holding has out-of-circuit support. *See, e.g.*, *Lakin Law Firm, P.C. v. Fed. Trade Comm'n*, 352 F.3d 1122 (7th Cir. 2003) (upholding redaction under Exemption 6 of identities of individuals who complained to the FTC about illegal business activity); *Strout v. U.S. Parole Comm'n*, 40 F.3d 136 (6th Cir. 1994) (upholding redaction under Exemption 6 of identity of individuals who wrote to the Parole Commission opposing Strout's parole). Indeed, our own circuit's decision in *Forest Service Employees*, upholding redaction of employees' names from a report on a forest fire prepared by the Forest Service, provides some support for the district court's holding. *See* 524 F.3d at 1024.

Prudential has not contested on appeal the holding that the 2003 Letter and 2008 Email are "similar files" under Exemption 6. We therefore assume without deciding that the 2003 Letter and 2008 Email are "similar files" within the meaning of Exemption 6. *See Elec. Frontier Found.*, 639 F.3d at 886 (analyzing under Exemption 6 redaction of identities of lobbyists from communications sent by the lobbyists to federal agencies in attempts to influence legislation; noting that "this may be a closer question than the government describes"; and assuming without deciding that

the communications were "similar files" in the absence of objection by the requesting party).

## 2.  "Clearly Unwarranted Invasion of Personal Privacy"

The second requirement under Exemption 6 is that disclosure of the information "would constitute a clearly unwarranted invasion of personal privacy." § 552(b)(6). To answer this question, "we must balance the privacy interest protected by the exemptions against the public interest in government openness that would be served by disclosure." *Elec. Frontier Found.*, 639 F.3d at 886; *see also Ray*, 502 U.S. at 175.

### (i) Cognizable Personal Privacy Interest

To withhold information under Exemption 6, an agency must show that "*some* nontrivial privacy interest" is at stake. *U.S. Dep't of Def. v. FLRA*, 510 U.S. 487, 501 (1994).  If only a trivial privacy interest is implicated, then Exemption 6 cannot apply.  But if there is a "nontrivial privacy interest," then the agency must balance the individual's interest in personal privacy against the public's interest in disclosure. *See Forest Serv. Emps.*, 524 F.3d at 1027 ("'[S]ome nontrivial privacy interest' is sufficient to justify the withholding of information under Exemption 6 unless the public interest in disclosure is sufficient to outweigh it." (emphasis omitted)); *Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1229–30 (D.C. Cir. 2008) (once a court finds "anything greater than a *de minimis* privacy interest," it must then address "whether the public interest in disclosure outweighs the individual privacy concerns" (internal quotation marks omitted)).

A broad range of personal privacy interests are cognizable under FOIA, including under Exemption 6. The Court has emphatically rejected a "cramped notion of personal privacy." *U.S. Dept. of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 763 (1989). Individuals not only have an obvious privacy interest in being free from retaliation, harassment, embarrassment, or stigma. *Ray*, 502 U.S. at 176–77; *Forest Serv. Emps.*, 524 F.3d at 1026. They also have a privacy interest in simply "keeping personal facts away from the public eye." *Reporters Comm.*, 489 U.S. at 769. "[P]rivacy encompass[es] the individual's control of information concerning his or her person." *Id.* at 763.

In *Ray*, the Supreme Court held that Exemption 6 allowed the State Department to redact the names of Haitian nationals interviewed by the agency after they were involuntarily returned to Haiti. *Ray*, 502 U.S. at 171. The Court noted that disclosure of the identities of those who cooperated with the State Department investigation "could subject them or their families to embarrassment in their social and community relationships." *Id.* at 176 (internal quotation marks omitted). The Court gave "great weight" to the interviewees' privacy interest in being free "from any retaliatory action that might result from a renewed interest in their aborted attempts to emigrate," even though it was "impossible to measure" the danger of retaliation or other mistreatment. *Id.* at 176–77. The Court emphasized that the interviewees "might have been willing to discuss private matters that he or she would not otherwise expose to the public" because they had secured an "assurance of confidentiality." *Id.* at 177.

Our court has also upheld the non-disclosure of identifying information under Exemption 6. In *Forest Service Employees*, a "public interest watchdog organization"

requested release of a report prepared by the U.S. Forest Service.  524 F.3d at 1023.  The report contained a detailed narrative of the Service's heavily criticized response to a wildfire, and it concluded that the response contributed to the fire.  *Id.*  The Service released the report but redacted under Exemption 6 the names of its low- and mid-level employees identified in the report.  *Id*. at 1023, 1026.  We held that the redactions were justified under Exemption 6, recognizing as cognizable privacy interests the "potential for harassment," "embarrassment," and "stigma" that would arise from public association with the incident.  *Id.* at 1026.  Among other things, we noted that the plaintiff organization planned to contact the employees once their identities were disclosed, and that the media and others would likely contact the employees as well.  *Id*.

Similarly, in *Lahr v. National Transportation Safety Board*, 569 F.3d 964 (9th Cir. 2009), the National Transportation Safety Board released documents obtained during an investigation of the midair explosion of TWA Flight 800, but redacted under Exemptions 6 and 7(C) the names of eyewitnesses and investigating officers.  We wrote that "protection from [unwanted contact by third parties] facilitated by disclosure of a connection to government operations and investigations is a cognizable privacy interest under Exemptions 6 and 7(C)."  *Id.* at 976.  Relying on *Forest Service Employees*, we held that the identities of both the eyewitnesses and FBI investigators were protected from disclosure.  *Id.* at 976–78.

In some of these cases, the affected individuals had received an assurance of confidentiality from the government. Such an assurance is neither a necessary, nor a necessarily sufficient, condition for the existence of a cognizable

personal privacy interest under Exemption 6. *See Ray*, 502 U.S. at 177. But as the Court made clear in *Ray*, such an assurance is a relevant factor. *See id.* Here, the affidavit of HUD official Jackson tells us that HUD has a publicly announced policy of preserving the confidentiality of individuals who complain to the agency about violators of RESPA. We recognize that only the author of the 2008 Email specifically requested anonymity. But in light of the repeated public pronouncements of HUD's confidentiality policy, we conclude that the authors of both the 2003 Letter and 2008 Email had reasonable expectations that HUD would protect their confidentiality even without a specific request that it do so.

Given the circumstances of this case, we conclude that the authors of the 2003 Letter and 2008 Email have cognizable personal privacy interests under Exemption 6.

### (ii) Personal Privacy Interest and Public Interest in Disclosure

To determine whether releasing the identities of the authors of the letter and email "would constitute a clearly unwarranted invasion of personal privacy," we balance the interest in personal privacy against the public interest in disclosure. In performing that balancing, we "may properly discount . . . the probability" of an invasion of personal privacy. *Dep't of Air Force v. Rose*, 425 U.S. 352, 380 (1976). But the invasion of a personal privacy interest may be "clearly unwarranted" even when the invasion of privacy is far from a certainty, as demonstrated by two recent cases. In *Lahr*, we upheld the application of Exemption 6 to protect the identities of eyewitnesses to the explosion of TWA Flight 800 when there was a "*potential* for unwanted contact by

third parties, including the plaintiff [an individual interested in the cause of the explosion], media entities, and commercial solicitors." *Lahr*, 569 F.3d at 975 (emphasis added). Similarly, in *Forest Service Employees*, we upheld the application of Exemption 6 because of the "*potential* for harassment" by "the media, curious neighbors, and [the plaintiff organization]," and because releasing the employees' identities "*may* also subject them to embarrassment and stigma." *Forest Serv. Emps.*, 524 F.3d at 1026 (emphasis added).

The district court concluded that revealing the identities of the authors of the 2003 Letter and 2008 Email would likely invade the authors' privacy interests. *Prudential Locations*, 646 F. Supp. 2d at 1226–27. We agree with that conclusion. The authors of the two communications could easily be adversely affected if their identities become known. Given the nature of their communications, they appear to have inside knowledge of the mortgage industry in Hawai'i. HUD official Jackson stated that the agency promises anonymity to industry insiders who report suspected wrongdoing because of their vulnerability to retaliation such as loss of employment or loss of business. The district court noted in its opinion that Prudential had "mention[ed] the possibility of a civil lawsuit against the unidentified individuals for their 'sham' complaints." *Prudential Locations*, 646 F. Supp. 2d at 1225. Prudential went to the expense not only to make a FOIA request for HUD's records from the two investigations. When it received what appear to be all relevant documents, with only the identities of the authors of the 2003 Letter and 2008 Email redacted, Prudential then also went to the additional expense of filing a federal suit and pursuing an appeal with the sole aim of identifying the authors. Under these circumstances, we conclude that there is a significant

risk of harassment, retaliation, stigma, or embarrassment of the authors if their identities are revealed. *See Ray*, 502 U.S. at 176–77; *Forest Serv. Emps.*, 524 F.3d at 1026.

Against the authors' privacy interest, we weigh the public interest in disclosure of their names. The Court has narrowly defined the public interest that is cognizable in a FOIA balancing: "[T]he only relevant public interest in the FOIA balancing analysis [is] the extent to which disclosure of the information sought would 'she[d] light on an agency's performance of its statutory duties' or otherwise let citizens know 'what their government is up to.'" *Dep't of Def.*, 510 U.S. at 497 (1994) (quoting *Reporters Comm.*, 489 U.S. at 773) (second alteration in original). Revealing the identity of a private individual does not further the public interest unless it casts light on the conduct of the government:

> Official information that sheds light on an agency's performance of its statutory duties falls squarely within [FOIA's] statutory purpose. That purpose, however, is not fostered by disclosure of information about private citizens that is accumulated in various governmental files but that reveals little or nothing about an agency's own conduct.

*Reporters Comm.*, 489 U.S. at 773.

Prudential has not shown that learning the identities of those who wrote the letter or the email would add significantly to the already available information concerning the manner in which HUD has performed its statutory duties. Prudential has made no allegation, and has presented no evidence, that HUD performed either of the two

investigations improperly or inefficiently. Prudential does not contend that HUD's finding in the first investigation that Prudential had violated RESPA by awarding prizes for steering business to its jointly owned business was improper; nor does Prudential contend that the $48,000 fine, paid in settlement, was excessive in light of its violation of the law. Prudential also does not contend that HUD acted improperly or inefficiently in conducting the second investigation, at the end of which HUD concluded that the author's allegation of wrongdoing by Prudential could not be substantiated.

This case is quite different from *Electronic Frontier Foundation*, in which we held that there was a substantial public interest in learning the identities of lobbyists who had communicated with the executive branch in an attempt to influence legislation. The lobbyists had sought legislation that would provide retroactive protection from liability for telecommunications carriers that had cooperated with the government in conducting "a warrantless, electronic surveillance program on millions of American telephones." *Elec. Frontier Found.*, 639 F.3d at 879. We wrote:

> There is a clear public interest in public knowledge of the methods through which well-connected corporate lobbyists wield their influence. . . . With knowledge of the lobbyists' identities, the public will be able to determine how the Executive Branch used advice from particular individuals and corporations in reaching its own policy decisions. . . . In short, we find the public interest in "government openness that would be served by disclosure" of how the government makes decisions potentially

shielding firms lobbying (and donating to campaigns) from nine-figure liabilities to be plainly important.

*Id.* at 887–88. Here, the authors did not seek to influence legislation or to change any substantive policy. Instead, they alleged violations of an existing federal statute in communications to the federal agency charged with enforcing that statute.

There is nothing in the texts of the 2003 Letter or the 2008 Email, or in the actions of HUD in investigating the allegations of statutory violations, to suggest that knowledge of the identities of the authors would significantly "shed light on an agency's performance of its statutory duties or otherwise let citizens know what their government is up to." *Dep't of Def.*, 510 U.S. at 497 (internal quotation marks and alteration omitted). We therefore conclude that no public policy cognizable under Exemption 6 would be served by revealing their identities.

Because the authors of the communications have cognizable personal privacy interests in maintaining their anonymity, and because there is no cognizable public policy interest that would be served by revealing their identities, we hold that revealing their identities "would constitute a clearly unwarranted invasion of personal privacy" under Exemption 6.

### 3.  Exemption 7(D) and *Landano*

Prudential argues that the foregoing analysis makes Exemption 7 "superfluous," and undercuts the Supreme Court's interpretation of Exemption 7(D) in *United States*

*Department of Justice v. Landano*, 508 U.S. 165 (1993).  We disagree.

Exemption 7 applies to "records or information compiled for law enforcement purposes."  5 U.S.C. § 552(b)(7).  Such records are exempt from a FOIA request, but only if they satisfy the criteria of at least one of six subcategories of Exemption 7 — Exemptions 7(A) through 7(F).  Exemption 7(D) provides that a law enforcement record need not be released if it "could reasonably be expected to disclose the identity of a confidential source."  *Id.* § 552(b)(7)(D).  In *Landano*, the Court established the criteria by which a law enforcement "source" can qualify as "confidential" within the meaning of Exemption 7(D).  *See Landano*, 508 U.S. at 179–80.

Prudential argues, though a little obliquely, that the 2003 Letter and 2008 Email are "records or information compiled for law enforcement purposes" within the meaning of Exemption 7, and that the authors of the 2003 Letter and the 2008 Email do not qualify as "confidential source[s]" under Exemption 7(D).  It then argues that if the identities of the authors are protected under Exemption 6, without any requirement that the authors satisfy the criteria for a "confidential source" contained in Exemption 7(D), Exemption 6 offers an end run around the more stringent requirements of Exemption 7.  We see no basis to conclude that the application of Exemption 6 in this case undercuts or is inconsistent with Exemption 7.

Exemption 7 operates differently from Exemption 6.  Under Exemption 7(D), if an individual satisfies the criteria for a "confidential source," then the "record[] or information compiled for law enforcement purposes" need not be

released. § 552(b)(7)(D). If the individual is a "confidential source," that is the end of the matter; there is no need to balance the individual's privacy interest against the public interest in disclosure, as is required under Exemption 6. However, if the individual does not satisfy the criteria for a "confidential source," he or she may nonetheless be protected under some other subcategory of Exemption 7. The subcategory most relevant to our case is Exemption 7(C), which exempts "records or information compiled for law enforcement purposes" if their disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy." *Id.* § 552(b)(7)(C).

We are willing to assume that the 2003 Letter and 2008 Email are "records or information compiled for law enforcement purposes" within the meaning of Exemption 7. If HUD had characterized them as such and had relied on Exemption 7(C) to exempt them from release, we would balance the authors' privacy interests against the public interest in disclosure, much as we have just done under Exemption 6. What Prudential fails to recognize is that Exemption 7(C) is more protective of privacy than Exemption 6. As the Supreme Court noted in *Reporters Committee*, "Exemption 7(C)'s privacy language is broader than the comparable language in Exemption 6 in two respects." 489 U.S. at 756. First, Exemption 6 requires that the invasion of privacy be "clearly unwarranted," whereas Exemption 7(C) requires only that the invasion be "unwarranted." Second, Exemption 6 requires a disclosure that "would constitute" an invasion of privacy, whereas Exemption 7(C) requires only that a disclosure "could reasonably be expected to constitute" an invasion of privacy. However, because HUD has chosen to rely on Exemption 6 rather than Exemption 7(C), we need

not examine whether the 2003 Letter and the 2008 Email would also be protected under Exemption 7(C).

## Conclusion

For the foregoing reasons, we conclude that HUD properly withheld the identities of the authors of the 2003 Letter and the 2008 Email. We therefore affirm the district court.

**AFFIRMED.**

BERZON, Circuit Judge, dissenting:

The Freedom of Information Act ("FOIA") establishes a strong default rule: Government *must* disclose information in its possession unless it invokes, at its discretion, one of nine narrow exemptions. *See, e.g.*, *U.S. Dep't of Def. v. FLRA*, 510 U.S. 487, 494 (1994) (citing *U.S. Dep't of Air Force v. Rose*, 425 U.S. 352, 360–61 (1976)); *see also* 5 U.S.C. § 552(b)(1)–(9) (enumerating exemptions). Here, HUD has invoked only Exemption 6, which authorizes withholding "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Applying that exemption requires balancing the personal privacy interests it protects "against the public interest in government openness that would be served by disclosure." *Lahr v. Nat'l Transp. Safety Bd.*, 569 F.3d 964, 973 (9th Cir. 2009).

The majority identifies a personal privacy interest which may not exist, and then weighs the public interest in

disclosure too lightly. And it does both in the name of reducing the government's burden in complying with the law, a concern with no application here. I dissent.

## I.

Were it up to me, I would do what we did in our original resolution of this case—remand to the district court for further factual development. *See Prudential Locations LLC v. U.S. Dep't of Housing & Urban Dev.*, 648 F.3d 768, 778–79 (9th Cir. 2011), *vacated and rehearing granted*, 665 F.3d 1379 (9th Cir. 2012). The present record is inadequate to confirm the existence of *any* personal privacy interest, let alone to balance it against the public interest in naming those informants whose tips our government deems credible enough to merit investigation.

## A.

**1.** Exemption 6 applies only where some "personal privacy" interest is at stake. *See Rose*, 425 U.S. at 371, 375 n.14. A "'nontrivial privacy interest'" can be enough to trigger further analysis under the exemption. *See Forest Serv. Emps. for Envtl. Ethics v. U.S. Forest Serv.*, 524 F.3d 1021, 1026–27 (9th Cir. 2008) (quoting *FLRA*, 510 U.S. at 501). But if *no* nontrivial privacy interest is in jeopardy, then FOIA requires disclosure. *See Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1229–30 (D.C. Cir. 2008).

A nontrivial privacy interest does not exist merely because the government asserts it. Rather, FOIA's "strong presumption in favor of disclosure places the burden on the agency to justify the withholding of any requested documents." *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173

(1991); *Maricopa Audubon Soc'y v. U.S. Forest Serv.*, 108 F.3d 1089, 1092 (9th Cir. 1997); 5 U.S.C. § 552(a)(4)(B). Like all parties on summary judgment, the government must adduce specific evidence to carry its burden. *See* Fed. R. Civ. P. 56(c).

The government in this case has submitted no evidence whatever concerning the relevant circumstances or privacy concerns of the individuals who filed the complaints of wrongdoing with HUD. In the face of this vacuum, the majority in effect holds that the government carries its burden of demonstrating a nontrivial privacy interest *simply* by specifying that the individual whose name is being withheld reported alleged wrongdoing to a government official. FOIA Exemption 6 requires more.

Exemption 6 provides protection for "*personal* privacy." 5 U.S.C. § 552(b)(6) (emphasis added). The case law gives effect, as it must,[1] to the "personal" modifier, requiring the government to demonstrate *either* that disclosure of an individual's name would be linked with *personal* details about his life or that disclosure would subject an individual to harassment in his *personal* life.

In *United States Department of State v. Ray*, for example, the Court invoked both of these circumstances in approving withholding the names of involuntarily repatriated Haitians interviewed pursuant to a State Department investigation. *Ray*, 502 U.S. at 175–76. It noted that "highly personal

---

[1] "'We have long followed the principle that '[s]tatutes should not be construed to make surplusage of any provision.'" *Local Joint Exec. Bd. of Las Vegas v. NLRB*, 657 F.3d 865, 675–76 (9th Cir. 2011) (quoting *Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 834 (9th Cir. 1996)).

information regarding marital and employment status, children, living conditions and attempts to enter the United States, would be linked publicly with particular, named individuals." *Id.* In addition, the Court highlighted the danger that Haitians cooperating with the State Department investigation might be subject to retaliatory action for illegally departing Haiti, or that interviewees would be embarrassed "in their social and community relationships." *Id.* at 176.

Our cases, too, are consistent with this understanding of Exemption 6's requirement of "personal" exposure or harassment. *Forest Service Employees*, for example, permitted the application of Exemption 6 to the names of low-level federal employees because they could personally be subject to "embarrassment and stigma" or "harassment" by litigants and media. 524 F.3d at 1026. Similarly, *Lahr* affirmed the application of Exemptions 6 and 7(C) where disclosing the names of eyewitnesses to an accident could expose them to "undesired contact[]" by litigants and media. 569 F.3d at 975–77.

The majority purports to rely on these cases.[2]  But none of them upheld application of Exemption 6 *solely* because the identified individuals provided information to the government.  In each case, the government revealed more than that about the circumstances of those individuals whose names the government sought to withhold.  And it was that additional information that established the danger of exposure

---

[2] I agree with the majority that treating files such as those in this case, *Forest Employees*, and *Lahr* as "similar files" for the purpose of Exemption 6 is problematic, and add some additional reasons why that is so.  Maj. Op. 10–11.

First, the grammatical "rule of the last antecedent" compels a narrow construction of "similar files."  Under that rule, a relative pronoun refers to the nearest reasonable antecedent.  *See, e.g.*, *Barnhart v. Thomas*, 540 U.S. 20, 26–27 (2003); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 144–46 (2012).  Here, the relative pronoun "which" attaches only to "similar files"—not "personnel and medical files"—and describes how the relevant files must be "similar" to personnel or medical materials.  That description thus indicates that disclosure of the files as a whole (although not every record in the files) must, *like* the disclosure of personnel and medical files, entail a "clearly unwarranted invasion of personal privacy."

Second, application of the familiar *ejusdem generis* canon also suggests that the catch-all term—"similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy"—should be "'construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words.'"  *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114–15 (2001) (quoting 2A N. Singer, *Sutherland on Statutes and Statutory Construction* § 47.17 (1991)).  "[P]ersonnel and medical files" are, by definition, *about* individuals and their personal lives—their bodies, their families, their financial circumstances, their criminal and disciplinary records, if any.  "Similar files" ought to carry a parallel meaning, and so not reach files that are about the wrongdoing of other people and contain no such personal data about the informant.

of personal information or of harassment in the informants' personal lives.

*Ray*, 502 U.S. at 176, for example, concerned the identity *and* personal information of repatriated Haitian emigrants potentially vulnerable to government persecution in Haiti for having unlawfully fled the country. *Forest Service Employees*, 524 F.3d at 1026, concerned low-level government employees, some of whom were associated with serious allegations of misconduct as to *themselves*, in the context of pending litigation and much public uproar. And *Lahr*, 569 F.3d at 975–77, concerned bystander eyewitnesses and investigators of an infamous plane crash, whom the plaintiff expressly wished to contact against the backdrop of substantial media attention. Such additional details—not the bald claim that the identified individuals provided information to the government—established the existence of a personal privacy interest. Moreover, in each of these instances, the underlying investigation, about which the plaintiffs sought records, had been triggered by the government. For that reason, the information sought was "personal" in the sense that it concerned individuals who had not voluntarily entered the public sphere with regard to the information collected by the government.

The majority's opinion thus breaks new ground by finding in the names of voluntary government informants a *per se* personal privacy interest. Still worse, the majority's *per se* rule departs from statute as well as precedent, because it does nothing to verify that the purported privacy interest protected by nondisclosure is *personal* in nature.

The majority's rule would see a cognizable "personal privacy" interest in any informant's name, without more.

"Personal privacy" under Exemption 6 is not so broad. Disclosure of the names of those providing information to the government is not "inherently and always a significant threat to the privacy of the [named] individuals." *Ray*, 502 U.S. at 176 n.12. To be sure, an informant's name refers to his person and is in that narrow sense "personal." But "'[p]ersonal' in the phrase 'personal privacy' conveys more than just 'of a person.' It suggests a type of privacy evocative of human concerns." *FCC v. AT & T, Inc.*, 131 S. Ct. 1177, 1183 (2011).

In some circumstances, revelation of an informant's name does not raise the "human concerns" evoked by the term "personal privacy." Consider, for example, the business executive accusing his competitor of lawbreaking. Such an informant acts on behalf of the business that employs him. And business concerns rarely qualify as "human concerns" of the sort encompassed by "personal privacy." "[W]e often use the word 'personal' to mean precisely the *opposite* of business-related: We speak of personal expenses and business expenses, personal life and work life . . . ." *Id.* at 1182 (emphasis in original).

For example, *Electronic Frontier Foundation v. Office of the Director of National Intelligence*, 639 F.3d 876, 888 (9th Cir. 2010), which required the government to disclose the names of business lobbyists, minimized almost to the point of non-existence the notion that there was any "personal privacy" interest in the "nature of their employment." There, we reasoned that "government acknowledgment of a lobbyist's lobbying activities does not reveal sensitive personal information about the individual rising to a clearly unwarranted invasion of personal privacy." *Id.* (internal quotation marks omitted); *see also Wash. Post Co. v. U.S.*

*Dep't of Justice*, 863 F.2d 96, 100 (D.C. Cir. 1988) ("Information relating to business judgments and relationships does not qualify" as a personal privacy interests under Exemption 7(C), "even if disclosure might tarnish someone's professional reputation."). Similarly, if one firm, acting through an officer or other agent, retaliates in the marketplace against another for blowing the whistle, I see no invasion of *personal* privacy.

Nor is there necessarily a nontrivial *personal* privacy interest in the name of a senior government official when such an official acts as an informant. True, "'individuals do not waive all privacy interests in information relating to them simply by taking an oath of public office.'" *Lahr*, 569 F.3d at 977 (quoting *Lissner v. U.S. Customs Serv.*, 241 F.3d 1220, 1223 (9th Cir. 2001)). But the personal privacy interests of senior officials are especially attenuated. *Lahr*, 569 F.3d at 977 (citing *Dobronski v. FCC*, 17 F.3d 275, 280 n.4 (9th Cir. 1994)). Where such a senior official voluntarily submits information to the government to trigger a governmental investigation, his affirmative act may further weaken any putative privacy interest in his name. *See Elec. Frontier Found.*, 639 F.3d at 887–89 (noting that voluntary submission of information intended to affect public policy minimizes an informant's privacy interest). In an appropriate case, a court could well determine that such a senior government official possesses, at best, a trivial personal privacy interest in withholding his name.

Nor, in the particular circumstances of this case, are there any obvious personal privacy interests jeopardized by the disclosure of an informant's name if the informant is wholly unaffiliated with either Prudential or the real estate industry. Such an unrelated informant is not especially vulnerable to

retaliation or harassment from his employer, co-workers, or friends, as might be true if he worked for Prudential or a related firm. For this reason, too, a privacy interest put in danger "more palpable than [a] mere possibilit[y]" would need to be identified. *Rose*, 425 U.S. at 380 n.19.

**2.** The majority sidesteps these concerns with unwarranted conjecture. "Given the nature of [the informants'] communications," the majority speculates, "they *appear* to have inside knowledge of the mortgage industry in Hawai'i." Maj. Op. 15 (emphasis added). Inferences of this variety cannot carry the day in the present context. This is an appeal from the grant of summary judgment *against* Prudential, so "[w]e draw all reasonable inferences in the light most favorable to the non-moving party." *Corns v. Laborers Int'l Union of N. Am.*, 709 F.3d 901, 907 (9th Cir. 2013). "Appearance" seems to be another word for inference, yet other inferences—such as the inference that the information came from a disgruntled former customer—are also possible.

Even were it otherwise proper, the majority's inference would remain unreasonable. These informants purported to draw their facts from a newspaper article and a conversation with a Prudential employee, respectively—hardly the stuff of "inside knowledge."

The majority continues by suggesting that Prudential itself may harass, retaliate against, stigmatize, or embarrass the informants. After all, the majority hints, Prudential went to the expense of filing a FOIA request and, when it was dissatisfied with HUD's response, initiated a lawsuit that it has carried through appeal. Maj. Op. 15. Once again, the inference of malice that the majority draws from this

litigation history is not its to make. This Court may only take judicial notice of "a fact that is not subject to reasonable dispute." Fed. R. Evid. 201(b). And Prudential's motivations for pursuing its legal options are reasonably disputable. It may, for example, wish to lobby HUD to improve its complaint screening process to weed out non-credible informants. Or it may wish to improve its own internal confidentiality policies.

My point is not that these alternative inferences are compelled by the record, or even that they are more reasonable than the majority's inferences. Rather, the reasonable possibility of such motivations renders the majority's preferred interpretation "subject to reasonable dispute" and hence beyond the scope of its authority in reviewing a summary judgment record as barren as this one.[3]

**3.** In sum, there can be no *per se* rule that those who provide information about the alleged wrongdoing of others have a personal privacy interest in their identity subject to a threat "more palpable than [a] mere possibilit[y]," *Rose*, 425 U.S. at 380 n.19. Because the record in this case leaves us speculating about the personal privacy interests of the

---

[3] The majority's attempts to shore up its inference by observing that the district court opinion noted that Prudential had "mention[ed] the possibility of a civil lawsuit against the unidentified individuals for their 'sham' complaints." Maj. Op. 15. Any such "mention," however, appears nowhere in the record. Rather, the district court misinterpreted one of Prudential's legal arguments—that public policy does not protect those who file unsupported complaints with the government—as a statement of Prudential's intentions. In any case, HUD does not rely on the district court's unsupported finding on appeal. The majority should not do so, either.

informants, I would remand to the district court to develop the record.

Moreover, even if we could infer from the absence of a record—which we cannot—that there is *some* nontrivial privacy interest on the part of the informants, we have no clue what it is. Once a nontrivial privacy interest is established, the next stage of the analysis is to evaluate whether invasion of that interest is "clearly unwarranted" by the countervailing public interest in disclosure. *See Lahr*, 569 F.3d at 973. Executing that balancing analysis requires knowing something about the nature and strength of the privacy interest at stake. We cannot balance a personal privacy interest whose measure we have yet to take.

## B.

Not only is the majority's understanding of "personal privacy" interests too broad, its account of the public policy interests protected by disclosure is too narrow. The majority unnecessarily constricts its inquiry by focusing only on a public interest in exposing government *impropriety or inefficiency*. It fails to acknowledge, let alone reject, the broader public interest that Prudential advances.

As the majority correctly notes, only a disclosure that "would 'she[d] light on an agency's performance of its statutory duties' or otherwise let citizens know 'what their government is up to,'" qualifies as a cognizable public interest under FOIA. *FLRA*, 510 U.S. at 497 (quoting *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989)). But that does not mean, as the majority's analysis at some points suggests, that the plaintiff must have demonstrated that the government's

behavior may have been *improper or inefficient*.  "[P]ublic understanding of the operations or activities of the government," *Reporters Comm.*, 489 U.S. at 775, includes not only exposure of government misfeasance, but also of governmental effectiveness and other aspects of internal agency functioning.[4]

Consider, for example, *Reporters Committee*, 489 U.S. 749.  There, the Supreme Court held out *Rose*, 425 U.S. 352, as an example of disclosure that advanced the public interest in understanding the workings of government.  That case, *Reporters Committee* explained, required the disclosure of Air Force Academy disciplinary-hearing summaries because they "obviously contained information that would explain how the disciplinary procedure actually functioned and therefore were an appropriate subject of a FOIA request." *Reporters Comm.*, 489 U.S. at 773.  The interest was purely informational; suspected government misfeasance had nothing to do with it.  Because the public interest in disclosure is broader than the exposure of official wrongdoing, the majority's preoccupation with Prudential's failure to allege that "HUD performed either of the two investigations improperly or inefficiently" is beside the point. Maj. Op. 16–17.

---

[4] *See Cooper Cameron Corp. v. U.S. Dep't of Labor*, 280 F.3d 539, 548 (5th Cir. 2002) ("[T]here is a cognizable public interst in monitoring agencies' enforcement of the law . . . ."); *Nation Magazine, Wash. Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 895 (D.C. Cir. 1995) (recognizing a public interest in understanding the "'privatization of government functions,'" particularly law enforcement investigations); *cf. Brock v. Pierce Cnty.*, 476 U.S. 253, 262 (1986) ("[T]he protection of the public fisc is a matter that is of interest to every citizen . . . .").

On this more expansive view of the public interest in knowing "what the government is up to," Prudential *did* explain how disclosure would advance the public knowledge of HUD's performance of its statutory duties:  Prudential argued that HUD's operations "cannot be fully understood without knowing *who* initiates or influences investigations." It articulated concern that HUD had initiated investigations "based on accusations from potentially biased, self-interested, or otherwise unreliable sources."

Although the majority's does not so state, this concern is legitimate.  Government investigations carry costs, burden the public fisc, and divert resources from other potentially meritorious activities.  Meanwhile, targeted individuals and entities are saddled with disruptive inquiries, the costs of compliance, and, above all, tarnished reputations.  *See, e.g.*, Richard A. Bierschbach & Alex Stein, *Overenforcement*, 93 Geo. L.J. 1743, 1771–72 (2005) (collecting sources concerning the "significant extralegal sanctions for the defendants and their employees" associated with investigation of corporate misfeasance or conviction).  Agencies, and the firms and individuals they investigate, will bear those costs even when investigation does not support further prosecution. Given the costs and collateral damage, the public is entitled to know what tips its government deems sufficiently reliable to merit investigation.[5]

---

[5] I note that although Prudential is a business entity, government agencies investigate many individuals for wrongdoing—for example, taxpayers, social security and other benefit recipients, and alleged undocumented immigrants.  Undoubtedly, many of these investigations are triggered by information voluntarily provided by members of the public, for motives good and ill.  The majority's approach to this case would presumably apply to such instances as well.  That approach could preclude, in the absence of allegations of misfeasance, the revelation of

Fully evaluating reliability, in turn, usually requires knowing an informant's name.  Reliability is generated by features both external and internal to a statement.  External indicia of reliability relate to the identity of the informant.  Knowledge of an informant's identity enables assessment credibility, through what *Florida v. J.L.*, 529 U.S. 266, 270 (2000), termed "reputation."  *See Illinois v. Gates*, 462 U.S. 213, 233–34 (1983) (noting that "an unquestionably honest citizen" or an informant with a history of "unusual reliability" would be especially credible).  Where an informant is "known . . . personally and had provided . . . information in the past," for example, his statement is more reliable than "an anonymous telephone tip."  *Adams v. Williams*, 407 U.S. 143, 146 (1972).  By contrast, internal indicia relate to the contents of an informant's statement—its measure of detail or the evidentiary base on which it purports to rest.  *See Gates*, 462 U.S. at 234 (noting that an "explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand," enhances a tip's credibility).  Without more, however, "'an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity.'"  *J.L.*, 529 U.S. at 270 (quoting *Alabama v. White*, 496 U.S. 325, 329 (1990)).  To be deemed reliable, the statement must include independently verifiable details, such as accurate prediction of a suspect's future behavior.  *See id.* at 270–71; *United States v. Morales*, 252 F.3d 1070, 1076 (9th Cir. 2001) (reviewing cases concerning anonymous tips).  In other words, *some* external validation is always needed; a statement cannot be considered reliable without it.  And the informant's identity is almost always the best way of providing such external validation.

---

information that might bring to light the criteria used to determine which such informant-provided information is investigated and to what degree.

Thus, the "marginal additional usefulness," *Forest Serv. Emps.*, 524 F.3d at 1027 (internal quotation marks omitted), of knowing an informant's name—that is, the degree to which the informant's name adds to one's ability to assess reliability—is substantial.  And such a significant aid to the evaluation of reliability must be taken into account in determining whether an invasion of personal privacy is "*clearly* unwarranted."   5 U.S.C. § 552(b)(6) (emphasis added).

In particular, the possibility of what Prudential calls "biased" or "self-interested" tips enhances the public interest in identifying informants.  As noted, an investigation injures its targets, even if it ultimately exonerates them.  For this reason, what children call "snitching" can be an effective way to settle a personal score or gain a competitive advantage in the marketplace.[6]  If an informant successfully triggers a baseless investigation for personal gain, he will have put government power to private purpose.  That danger is preeminently a public concern.  *Cf. Exxon Shipping Co. v. U.S. Dep't of Interior*, 34 F.3d 774, 779 (9th Cir. 1994) (acknowledging, in the context of discovery requests arising out of litigation to which the government was not party, "the government's serious and legitimate concern that its employee resources not be commandeered into service by

---

[6] These are hardly far-fetched possibilities.  *See, e.g.*, *Portomene v. United States*, 221 F.2d 582, 583 (5th Cir. 1955) (describing an allegation that "there was bad blood between [an informant] and the defendant, and that this furnished the motive for [the informant's] desiring to involve [the defendant] by false charges that he had dealt in narcotics"); *Medifast, Inc. v. Minkow*, No. 10-CV-382 JLS (BGS), 2011 WL 1157625, at *1 (S.D. Cal. Mar. 29, 2011) (describing an alleged "series of coordinated attacks" on a company, including accusations of regulatory violations, designed 'to increase the value of a short position'").

private litigants to the detriment of the smooth functioning of government operations"). Such a danger, moreover, is precisely the sort of potential corruption that the FOIA sought to forestall by limiting secrecy.[7] And knowing who alleges illegality can be helpful in assessing the scope of such possible corruption. Without names, the public is hampered in evaluating the prevalence of self-interested informants or the magnitude of their manipulation.

I do not understand the majority affirmatively to reject these considerations, but instead to disregard them, evidently as insufficiently raised. I disagree on the latter point. And I expect that a future panel, adjudicating a case where such concerns are fully articulated, will be attentive to the full scope of the public interest in learning "what the government is up to" in the processing of complaints by outside informants.

---

[7] FOIA ensures citizen oversight over the government, "a structural necessity in a real democracy." *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004). In the debate over the FOIA amendments, legislators sometimes contrasted that commitment to democratic oversight with "the unhappy consequences of the other alternative," playing out "behind the Iron Curtain." 1 *Freedom of Information Act Source Book: Legislative Materials, Cases, Articles* 78 (1974); *see also id.* at 83 (calling a "policy of secrecy . . . the cornerstone of a totalitarian bureaucracy"). And behind the Iron Curtain, where informing was widespread, informants often "snitched" on their rivals for personal gain. *See, e.g.*, Robert Gellately, *Denunciations in Twentieth-Century Germany: Aspects of Self-Policing in the Third Reich and the German Democratic Republic*, 68 J. Modern Hist. 931, 944–50, 956 (1996) (documenting the prevalence of informing for personal gain in Nazi and communist Germany).

C.

Recognizing the public interest in disclosing informants' names does not, by any means, preclude the application of Exemption 6.  Had HUD produced evidence (*in camera*, if necessary) concerning its informants' vulnerability to retaliation, for example, that personal privacy interest might well outweigh the public interest in disclosure, rendering disclosure of the informants' identities "clearly unwarranted."

That is not, however, the balance struck by the majority. To the contrary, it arrives at a balance unsupported by the record:  It assumes a personal privacy interest where there may well be none, and it ignores countervailing interests that go beyond governmental misconduct.  Again, I would remand for further development of the record.

II.

The majority's treatment of this case is all the more frustrating because it is unnecessary.  The history of this case establishes the background for understanding why:  In our initial resolution of the matter, we remanded for further factual development as to the personal privacy interests of the informants on the grounds articulated above, *supra* Part I.A. *Prudential Locations*, 648 F.3d at 778–79.  In a petition for rehearing, however, the government complained that demanding *some* evidence of a personal privacy interest would burden its administration of the statute, and sought a more deferential rule.  In reversing course, today's decision would seem to have answered the government's call.  The Supreme Court, however, has commanded us to refuse such invitations to enervate FOIA.  In any case, Congress has

already provided less burdensome means for the government to protect its informants.

## A.

The premise of the government's objection is sound enough:  The FOIA *is* a burden.  *See, e.g.*, Antonin Scalia, *The Freedom of Information Act Has No Clothes*, Regulation, Mar./Apr. 1982, at 15 (quipping that FOIA is "the Sistine Chapel of cost-benefit analysis ignored").  In 2012 alone, HUD fielded some 2,544 FOIA requests, which it processed with the equivalent of over thirty staff members at an aggregate cost of over $3 million (not counting litigation expenses).  U.S. Dep't of Housing and Urban Dev., 2012 Annual FOIA Report, at 6, 18 (2012).

But these costs cannot be dismissed as useless expenditures.  Congress imposed them for a reason—to "ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed."  *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (citation and quotation marks omitted).  Consistent with the objective of facilitating disclosure, the Supreme Court has repeatedly commanded that FOIA's exemptions are exclusive and "'narrowly construed.'"  *Milner v. U.S. Dep't of Navy*, 131 S. Ct. 1259, 1262 (2011) (quoting *FBI v. Abramson*, 456 U.S. 615, 630 (1982)); *see also id.* at 1265–66 (collecting additional Supreme Court cases).  Indeed, recent jurisprudence has taken a sharply textual approach to interpreting FOIA exemptions.  *See* Peter L. Strauss et al., *Gellhorn and Byse's Administrative Law: Cases and Comments* 471 (11th ed. 2011) (citing, as examples, *Milner*, 131 S. Ct. 1259, and *AT & T*, 131 S. Ct. 1177).

This Court cannot relieve the government of the burden that Congress expressly placed upon it.  Although a *per se* rule protecting the identify of government informants would be simple to administer, "we are not free to engraft that policy choice onto the statute that Congress passed."  *U.S. Dep't of Justice v. Landano*, 508 U.S. 165, 181 (1993).  To the contrary, Congress "created a scheme of categorical exclusion; it did not invite a judicial weighing of the benefits and evils of disclosure on a case-by-case basis."  *Abramson*, 456 U.S. at  631.

This Court should, of course, seek to develop "workable rules" for the agencies to follow, *Reporters Comm.*, 489 U.S. at 779, but only within the confines of the exemptions Congress created.  *Milner*, for instance, rejected on textual grounds a long-settled interpretation of Exemption 2, despite the danger that disclosure might "wreak havoc and make catastrophe more likely."  131 S. Ct. at 1271 (internal quotation marks and brackets omitted).  The Court reasoned that, if "Congress has not enacted the FOIA exemption the Government desires," or if the exemption that Congress enacted proves unworkable, then the government—here, HUD—may take its complaint to Congress.  *Id.*

In any case, demanding *some* evidence with which a reviewing court can substantiate and evaluate the nature and magnitude of a putative personal privacy interest is not especially burdensome.  Take *Landano*:  That case required an agency invoking FOIA exemption 7(D) to protect the identify of informants to "point to more narrowly defined circumstances that will support" the application of that exemption.  *Landano*, 508 U.S. at 179.  Such a "particularized approach," the Court held, "is consistent with

Congress' intent to provide workable rules of FOIA disclosure." *Id.* at 180 (internal quotation marks omitted).

I would require no more. Such evidence need not be adduced via elaborate, costly procedures; affidavits that "contain reasonably detailed descriptions of the documents and allege facts sufficient to establish an exemption" suffice. *Bowen v. U.S. Food & Drug Admin.*, 925 F.2d 1225, 1227 (9th Cir. 1991). In those rare circumstances that such affidavits would themselves compromise the identity of informants, they may be reviewed *in camera*. *Landano*, 508 U.S. at 180.

## B.

In addition, as the majority recognizes, Maj. Op. 19–20, much of the difficulty the government has putatively encountered in protecting the identity of voluntary government informers under Exemption 6 is of its own creation. FOIA includes a separate exemption expressly designed to facilitate the protection of informants, but the government did not invoke it here.

Exemption 7(D) authorizes withholding "records or information compiled for law enforcement purposes, but only to the extent" that disclosure "could reasonably be expected to disclose the identity of a *confidential source* . . . ." 5 U.S.C. § 552(b)(7)(D) (emphasis added). "[A] source is 'confidential,'" under this exemption, "if it 'provided information under an express assurance of confidentiality or in circumstances from which such an assurance could be reasonably inferred.'" *Rosenfeld v. U.S. Dep't of Justice*, 57 F.3d 803, 814 (9th Cir. 1995) (quoting *Landano*, 508 U.S. at 172). The exemption applies equally to the enforcement of

civil and criminal law. *Church of Scientology Int'l v. IRS*, 995 F.2d 916, 919 (9th Cir. 1993). Its application is not contingent on the existence of a personal privacy interest in nondisclosure, and does not require balancing that interest against the interest in disclosure. To the contrary, Exemption 7(D) represents Congress' own assessment of the appropriate balance when it comes to informants.

HUD has not invoked that exemption here. Whether it could sustain HUD's nondisclosure of *these* informants' names is thus a question for another day and another court.

The very existence of Exemption 7(D), however, strongly implies that Exemption 6 applies quite narrowly, if at all, to information concerning government informants. "'[I]t is a commonplace of statutory construction that the specific governs the general.' That is particularly true where, as [here], 'Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions.'" *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2071 (2012) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992), and *Varity Corp. v. Howe*, 516 U.S. 489, 519 (1996) (Thomas, J., dissenting)). Exemption 7(D) specifically applies to the withholding of information provided by informants. And it, unlike Exemption 6, sets a condition, requiring that any such informant be assured that his identity will remain confidential. Given this statutory scheme, Exemption 7(D)—not Exemption 6—ought to control the government's request to withhold information concerning its informants.[8]

---

[8] The same point applies with even greater force to Exemption 7(C), which the majority urges the government to invoke in the future. Maj. Op. 19–20. Exemption 7(C) is part of the very same subsection of FOIA as

Moreover, HUD's legitimate desire to withhold informants' identities can be readily accommodated by implementing procedures to document HUD's assurance that informants' names would be kept confidential. Where "the Government has other tools at hand to shield" the information it seeks to withhold, *Milner*, 131 S. Ct. at 1271, judicial distortion of other of FOIA's narrow exemptions, to avoid the requirements of the most directly applicable one, is unnecessary as well as illegitimate.

HUD, and other federal agencies, would be well advised to restrict their invocation of FOIA exemptions for voluntary informants to Exemption 7(D). Here, Prudential failed to contest whether HUD's correspondence with the informants qualified as "similar files" within the meaning of Exemption 6. Future plaintiffs will be less reticent. Meanwhile, the majority, while not rejecting their pertinence, does not weigh in its analysis the full range of the public interests in disclosure, seemingly on the ground of inadequate invocation. Future litigants, I suspect, will be more specific in cases like this one in articulating the public interests in disclosure, so future panels will conduct a more complete balancing analysis.

## CONCLUSION

For all these reasons, I respectfully dissent.

---

Exemption 7(D), so the general/specific canon should have particular force.